UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
                                      :

M.E., Individually and on Behalf of and as Parent
and Guardian of D.E., a student with a disability,    :

               Plaintiff,           :        REPORT AND
                                                RECOMMENDATION

               -v.-                :        14 Civ. 9370 (LAK) (GWG)

New York City Department of Education,           :

               Defendant.          :

------------------------------------------------------------------x
**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

       Plaintiff M.E. brings this action under the Individuals with Disabilities Education Act

("IDEA"), 20 U.S.C. § 1400 et seq., alleging that the defendant New York City Department of

Education ("DOE") denied her son, D.E., a free appropriate public education ("FAPE") for the

2012-13 school year.  Both sides have moved for summary judgment.[1]  For the reasons stated

below, the plaintiff's motion for summary judgment should be denied and the defendant's

---

[1] See Notice of Motion, filed May 1, 2015 (Docket # 16); Plaintiff's Memorandum of
Law in Support of Motion for Summary Judgment, filed May 1, 2015 (Docket # 17) ("P.
Mem."); Defendant's Notice of Cross-Motion for Summary Judgment, filed June 5, 2015
(Docket # 22); Defendant's Memorandum of Law in Support of its Cross-Motion for Summary
Judgment and in Opposition to Plaintiff's Motion for Summary Judgment, filed June 5, 2015
(Docket # 23) ("D. Mem."); Plaintiff's Memorandum of Law in Opposition to Defendant's
Cross-Motion for Summary Judgment and in Reply to Defendant's Opposition to Plaintiff's
Motion for Summary Judgment, filed July 10, 2015 (Docket # 25) ("P. Repl. Mem.");
Defendant's Reply Memorandum of Law in Further Support of its Cross-Motion for Summary
Judgment, filed July 24, 2015 (Docket # 26) ("D. Repl. Mem."); Letter from William B.
Scoville, Jr., filed Jan. 5, 2016 (Docket # 30); Letter from Nancy Bedard, filed Jan. 11, 2016
(Docket # 31); Letter from William B. Scoville, Jr., filed Jan. 11, 2016 (Docket # 32); Letter
from Nancy Bedard, filed Jan. 14, 2016 (Docket # 33).

motion for summary judgment should be granted.

I.  Background

   A.  Legal Background

   The Second Circuit has summarized the legal underpinnings of a suit under the IDEA as

follows:

> A state receiving federal funds under the IDEA must provide disabled children
> with a free and appropriate public education ("FAPE").  Cerra v. Pawling Cent.
> Sch. Dist., 427 F.3d 186, 192 (2d Cir. 2005).  To ensure that qualifying children
> receive a FAPE, a school district must create an individualized education program
> ("IEP") for each such child. See 20 U.S.C. § 1414(d); Murphy v. Arlington Cent.
> Sch. Dist. Bd. of Educ., 297 F.3d 195, 197 (2d Cir. 2002) (describing the IEP as
> the "centerpiece" of the IDEA system).  The IEP is "a written statement that sets
> out the child's present educational performance, establishes annual and short-term
> objectives for improvements in that performance, and describes the specially
> designed instruction and services that will enable the child to meet those
> objectives."  D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ., 465 F.3d 503, 507–08 (2d
> Cir. 2006) (internal quotation marks omitted).  The IDEA requires that an IEP be
> "reasonably calculated to enable the child to receive educational benefits."  Bd. of
> Educ. v. Rowley, 458 U.S. 176, 207, 102 S. Ct. 3034, 73 L. Ed.2d 690 (1982).  In
> New York, the state has assigned responsibility for developing IEPs to local
> Committees on Special Education ("CSEs"). N.Y. Educ. Law § 4402(1)(b)(1);
> Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 123 (2d Cir. 1998).  CSEs
> are comprised of members appointed by the local school district's board of
> education, and must include the student's parent(s), a regular or special education
> teacher, a school board representative, a parent representative, and others.  N.Y.
> Educ. Law § 4402(1)(b)(1)(a).  The CSE must examine the student's level of
> achievement and specific needs and determine an appropriate educational
> program.  Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 107–08 (2d Cir.
> 2007).  If a parent believes that his child's IEP does not comply with the IDEA,
> the parent may file a "due process complaint" (a type of administrative challenge
> unrelated to the concept of constitutional due process) with the appropriate state
> agency.  20 U.S.C. § 1415(b)(6).  In such cases, the IDEA mandates that states
> provide "impartial due process hearings" before impartial hearing officers
> ("IHOs").  Id. § 1415(f).  Under New York's administrative system, the parties
> first pursue their claim in a hearing before an IHO.  N.Y. Educ. Law § 4404(1).
> Either party may then appeal the case to the state review officer ("SRO"), who
> may affirm or modify the IHO's order.  Id. § 4404(2).  Either party may then
> bring a civil action in state or federal court to review the SRO's decision.  20
> U.S.C. § 1415(i)(2)(A).

R.E. v. New York City Dep't of Educ., 694 F.3d 167, 174-75 (2d Cir. 2012).  The due process

complaint may challenge "any matter relating to the identification, evaluation, or educational

placement of the child, or the provision of a free appropriate public education."  20 U.S.C.

§ 1415(b)(6)(A); accord M.O. v. New York City Dep't of Educ., 793 F.3d 236, 239 (2d Cir.

2015).

      "Parents who believe that a FAPE is not being provided to their child may unilaterally

enroll the child in a private school and seek tuition reimbursement from the school district."

M.O., 793 F.3d at 239 (internal punctuation and citation omitted).  Courts award reimbursement

according to a three-part test, frequently referred to as the "Burlington/Carter test."  See Sch.

Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass., 471 U.S. 359, 369-70, 374

(1985); Florence Cty. Sch. Dist. Four v. Carter, 510 U.S. 7, 12, 16 (1993).  "According to the

three-part Burlington/Carter test, the parents will be entitled to reimbursement if (1) the school

district's proposed placement violated the IDEA, (2) the parents' alternative private placement

was appropriate, and (3) equitable considerations favor reimbursement."  T.M. v. Cornwall Cent.

Sch. Dist., 752 F.3d 145, 152 (2d Cir. 2014) (citations omitted).

      B.  Background on the IEP and D.E.'s Attendance at the Rebecca School

      D.E. has an "autism spectrum" disorder.  IHO Dec. at 2; accord Complaint, filed

November 25, 2014 (Docket # 2) ¶ 12; Ex. D, Individualized Education Program, dated Feb. 15,

2012 ("Ex. D"), at 1 ("Disability Classification: Autism").[2]  At the start of the 2012-13 school

---

[2] We cite to Exhibits according to their designation in the Certified Administrative Record, which has been filed under seal.  The plaintiff's exhibits are lettered.  The defendant's are numbered.  We refer to documents submitted by the IHO as "IHO Ex.," followed by the Roman numeral assigned in the Certified Administrative Record.  "Tr." refers to the transcript of the hearing before the IHO.  "SRO Dec." refers to Decision of the SRO, No. 12-219, Application of the New York City Department of Education (July 31, 2014).  "IHO Dec." refers to Findings

year, the only school year at issue in this case, D.E. was five years old.  See Ex. D at 10.  From

2009 until 2011, D.E. attended a school called "P226@875M" ("PS 226").  (See Wiest: Tr. 57).

D.E. was in an "8:1:2" class at PS 226, meaning that there were eight students, one teacher, and

two paraprofessionals supporting the teacher.  (Wiest: Tr. 58).  A CSE reviewed D.E.'s status

and formulated an IEP for the 2011-2012 school year, recommending that D.E. be placed in a

"12:1:1" classroom.  See IHO Dec. at 14.  In a 12:1:1 class, there are twelve students and one

teacher, and a paraprofessional is dedicated to the student.  Ex. N, Individualized Education

Program, dated July 7, 2011, at 6; Complaint ¶ 45.  Pursuant to this plan, D.E. enrolled at a new

school, PS 255, for the 2011-2012 school year.  See IHO Dec. at 14-15.

      D.E. had significant problems at PS 255.  As related in testimony found credible by the

IHO, IHO Dec. at 14, D.E. "had a very difficult time following directions and rules in the

classroom.  He had tantrums almost every day; he would scream, kick, hit, scratch, go

underneath furniture, sometimes throw over furniture and on many occasions try to leave the

classroom,"  IHO Dec. at 3.  The school called Emergency Medical Services personnel to take

D.E. to a hospital during the most serious tantrums and the police were involved more than once.

See IHO Dec. at 4, 15.

      M.E. and school officials decided to reevaluate D.E.'s placement at PS 255.  See IHO

Dec. at 15.  D.E. was evaluated by both a non-DOE psychologist, Stephanie Erickson, see

Tr. 120-21; Ex. H, Psychological Evaluation, and a DOE employee, see Ex. E, Behavior

Intervention Plan; Ehrlich: Tr. 307.  The DOE employee's evaluation was incorporated into the

---

of Fact and Decision of Impartial Hearing Officer, Case Number 138692 (Oct. 16, 2012).

IEP.  Ehrlich: Tr. 307; Complaint ¶¶ 62, 65.[3]  A CSE reviewed D.E.'s program and developed an IEP for the 2012-13 school year.  Ehrlich: Tr. 303-04; Ex. D at 11.  The CSE issued a new IEP on February 15, 2012.  See Ex. D at 11.  The new IEP recommended a more structured "6:1:1" class, with six students, one teacher and one paraprofessional assigned to D.E.  See Ex. D at 6-7. The IEP was to apply for the remainder of the 2011-12 school year, as well as the 2012-13 school year until at least February 12, 2013.  See Ex. D at 1.[4]  Two days after the CSE issued the IEP, M.E. removed D.E. from PS 255 because "she did not feel comfortable with him remaining in PS 255.  His behavior and sleep patterns had become so erratic and he had to be dragged to school, often having a temper tantrum on the way."  IHO Dec. at 12-13.

The next step in the process was to identify a school that would implement the IEP, which is accomplished through a document called a Final Notice of Recommendation ("FNR"). E.g. Ex. C, Final Notice of Recommendation: Annual Review or Reevaluation.  M.E. eventually received four FNRs for the IEP, see Exs. C, Y, AA, BB.  M.E. rejected all of the placements proposed in the FNRs.  (See M.E.: Tr. 478, 481, 487).  The only two placements relied on by DOE for the 2012-13 school year, see D. Mem. at 6, 8, and thus the only two placements that need to be addressed, are (1) an FNR dated April 25, 2012, identifying P226@875M, see Ex. C;

---

[3] The evaluation is called a functional behavior analysis ("FBA").  The resulting report is a behavioral intervention plan ("BIP").  Ehrlich: Tr. 307; accord Ex. E, Functional Behavior Assessment; Complaint ¶¶ 62, 65.

[4] The parties characterize the projected lifetime of the 2012-13 IEP differently.  Compare P. Mem. at 5 (the 2012 IEP was to apply "for the remainder of the 2011-2012 school year and also for the 2012-2013 school year") with D. Mem. at 6 ("The [2012-13] IEP had a projected start date of April 13, 201[2] and was also intended to be implemented . . . until the projected annual review date of February 12, 2013.").

and (2) an FNR dated July 24, 2012, identifying PS94@361 ("PS 94"), see Ex. BB at 1.[5]

M.E. visited both PS 226 and PS 94.  (Berger: Tr. 25-26; M.E.: Tr. 479, 482).  M.E. found the schools inadequate because in her view most of the students she saw in D.E.'s potential classes functioned at a lower level than her son.  (E.g. M.E.: Tr. 480-81, 483-84).  M.E. testified that she observed students at PS 226 who "were there for the summer and seemed low functioning, some not verbal and all on modified assessment not standard assessment like [D.E.]."  IHO Dec. at 13.  M.E. testified that she only saw students who "would not be the ones [in D.E.'s class] in September."  Id.  While visiting PS 94, M.E. testified that "[she] was told that [D.E.'s] class would be a mixture of disabilities and functioning levels but each student would be taught to their IEP's.  Typically, the higher functioning students were recommended for an 8:1:1 program and could take part in inclusion activities with the other school in the building."  Id. Thus, M.E.'s objection to the proposed placements was her concern that M.E. would be put in a class where his peers functioned at a lower level than he did.

While the hearing on M.E.'s due process complaint was taking place, the Rebecca School offered D.E. admission on July 17, 2012.  Ex. X, Letter from Tina McCourt, dated July 17, 2012. D.E. began attending the Rebecca School on October 16, 2012.  See P. Mem. at 12; Complaint ¶ 143.  His tuition for the 2012-13 school year was $69,206.  See Enrollment Contract, 2012-2013 School Year, at 1.[6]  M.E. seeks to have DOE pay the Rebecca School tuition.  See

---

[5] One of the FNRs refers to a placement at PS226@76.  Ex. Y at 1.  DOE asserts this was intended only as a summer placement.  D. Mem. at 7.  M.E. asserts it was an offer for the 2012-13 school year.  E.g. P. Repl. Mem. at 13-14.  It appears DOE's characterization is correct.  See IHO Dec. at 17 (referring to the PS226@76 FNR as pertaining to "an interim service plan during the summer"); accord Verified Answer [of M.E.] ¶ 39; P. Mem. at 7.

[6] This document was included in the record by Order, filed Mar. 19, 2015 (Docket # 15).

Complaint at 24.

      C.  <u>Proceedings Before the IHO</u>

M.E. filed her first due process complaint on May 4, 2012.  Ex. B, Letter from Nancy

Bedard, dated May 4, 2012, at 1. The IHO hearing occurred over four days between June and

September 2012.  IHO Dec. at 2.  M.E.'s due process complaint took its final form on July 26,

2012, after two of the four IHO hearing days had taken place.  <u>See</u> Ex. V, Amended Request for

Impartial Hearing, dated July 26, 2012; <u>accord</u> IHO Dec. at 2.  In its final form, M.E.'s due

process complaint requested reimbursement of D.E.'s tuition at the Rebecca School to remedy

the alleged 2012-13 violation.  Ex. V, Amended Request for Impartial Hearing, dated July 26,

2012, at 2.

      1.  <u>The DOE's Case</u>

"The DOE called five witnesses and entered 34 documents in evidence" at the IHO

hearing.  IHO Dec. at 2.  "Susan Ehrlich, assistant principal at PS 255" testified about her school.

<u>Id.</u>  Ehrlich noted that D.E. "was at the top academically in his 12:1:1 class . . . [but] socially and

emotionally he was at the lowest level and his short attention span and disruptive behaviors

prevented him from achieving his potential."  <u>Id.</u> at 5.  She described a number of D.E.'s

tantrums in the fall of 2011, which occurred "almost every day."  <u>Id.</u> at 3.  She described specific

incidents of misbehavior, including days when emergency medical services and/or police came

to the school.  <u>See id.</u> at 3-5.  Ehrlich also discussed strategies used by PS 255 personnel to

manage D.E.'s tantrums, including "priming to prepare him for transitions" and "walk[ing] him

into the hall to calm down or into Ms. Ehrlich's office to play or read quietly."  <u>Id.</u> at 3.  Ehrlich

testified about a September 28, 2011, meeting to "discuss[] the need for reevaluation and

reopening of [D.E.'s] case to find a more suitable placement."  <u>Id.</u> at 4.  M.E. initially "refused to

consent" to such a meeting.  Id.  M.E. eventually acquiesced on the condition that D.E.'s

evaluations "not be done by PS 255 personnel."  Id. at 5.

Darlyne Aristide, "an administrator of special education for a Child First Network of 34

schools," also testified at the hearing about a meeting she had with M.E. and the principal at PS

255 "to facilitate conversation."  Id.  At that meeting in October 2011, "[t]he school agreed to

complete a survey" for an independent evaluator requested by M.E. and M.E. "agreed to share

the evaluation when it was completed."  Id.  "Ms. Aristide also participated in the IEP meeting

on February 15, 2012."  Id.  The participants in the IEP meeting reviewed the outside evaluation

as well as "a functional behavioral assessment done at the school."  Id.  The participants

discussed D.E.'s social and emotional difficulties, as well as "safety issues when he would run

out of the [class]room or try to run out of the [school] building"; they settled on a continued

"classification of autism and recommended a 12-month 6:1:1 class in a District 75 school with

related services of speech and [occupational therapy] and a 1:1 crisis paraprofessional."  Id. at 6

(citing D.E.'s 2012-13 IEP).

Qikang Wang testified as part of the DOE's case.  Id.  She "was the teacher of the 6:1:1

kindergarten class at PS 226 in April 2012."  Id.  She also taught D.E. during his summer school

placement at PS 226 in July and August 2012.  Id.  As is discussed further in Section IV below,

Wang testified about the functional levels of students in her class, D.E.'s performance in the

classroom, and strategies she employed for keeping D.E. focused and engaged.  See id. at 6-7.

Diane Librera, the "pupil accounting secretary at PS 255" in charge of "discharging

students to go to other schools," testified that "[f]or kindergarten students, attendance is not

mandatory and a student can be discharged at the request of the parent."  Id. at 7.  Librera

testified that "[o]n February 17, 2012, [M.E.] came to [Librera's] office and said she was taking

8

her son out of school, perhaps to travel." <u>Id.</u>  Librera discharged D.E. from PS 255.  <u>Id.</u>

Finally, Dr. Stacy Minondo, "director of placement, testified that her office sends out the final notice of recommendation (FNR) for a District 75 placement."  <u>Id.</u>  Minondo recalled "speaking with [M.E.] several times and making a number of site offers for a 6:1:1 class."  <u>Id.</u>  Minondo testified about the FNRs issued to M.E., including the April 25, 2012, FNR for PS 226, and the final July 24, 2012, FNR for PS 94.  <u>Id.</u>

2.  <u>M.E.'s Case</u>

M.E. "presented five witnesses and 31 documents" before the IHO.  <u>Id.</u>  Nicole Berger, the "site coordinator" for PS 226, testified as part of M.E.'s case.  <u>Id.</u>  Her testimony is discussed in more detail in Section IV below.  Berger testified that D.E. had been in an 8:1:2 class for the 2010-11 year, and was placed in a 12:1:1 class for kindergarten.  <u>Id.</u>  Berger testified about some of D.E.'s behavior problems.  <u>Id.</u> at 7-8.  She also discussed a telephone call from PS 255, during which the caller "reported that they had to call 911 several times because of [D.E.'s] behavior." <u>Id.</u> at 8.  The caller "requested information on how PS 226 had managed [D.E.'s] behavior, especially during transitions."  <u>Id.</u>  Berger testified about M.E.'s visit to PS 226 on May 8, 2012. <u>Id.</u>  Berger showed M.E. two 6:1:1 kindergarten classes during this visit, including the one taught by Ms. Wang.  <u>Id.</u>[7]

Caroline Wiest "taught [D.E.] for two years in a class of 8:1:2."  <u>Id.</u>  Wiest discussed D.E.'s time in her class, noting that "[d]uring the two years, [D.E.] was able to function more independently and the prompts and structures" that Wiest used to ease transitions "were reduced."  <u>Id.</u>  Wiest described D.E. as "the only student in his class in 2010-2011 who could

---

[7] The IHO identified this teacher as "Ms. Yang."  IHO Dec. at 8.

engage in typical back and forth communication on a topic." Id. She testified that "[t]o develop positive social relationships, he needed to be around peers who can respond appropriately and give him feedback." Id. Wiest also testified about D.E.'s behavioral problems, id. at 8-9, and noted that "[h]is behavior improved during the two years, and his tantrums lessened, because he had matured, his cognitive and communicative skills had improved, he was very comfortable in the extremely structured classroom and he was better able to express his distress verbally," id. at 9. Wiest participated in the 2011 meeting which led to D.E.'s placement at PS 255 for kindergarten. Id. "She agreed with the recommendation of a 12:1:1 class in a community school with a 1:1 paraprofessional because she believed the District 75 programs . . . were too restrictive, had students with more significant cognitive impairments and would not have offered the social and academic environment [D.E.] was ready for." Id.

Dr. Stephanie Erickson, "program director of the developmental evaluation clinic at Kings County Hospital," testified "that her team prepared a psychological evaluation of D.E. on November 4, 2011." Id. Erickson's testing "suggest[ed] that [D.E.] is capable of performing grade level or higher work at school. . . . If he were in a class of children functioning below grade level, he would be under-stimulated and unengaged and more likely to act out his disruptive behaviors because of boredom." Id. Erickson testified that "[i]t is important for [D.E.] to be in a class with verbal students to encourage him to use language in a give-and-take exchange with his peers and to prevent him from regressing by imitating students with nonverbal means of communication including inappropriate behaviors." Id. at 9-10. Erickson recommended "a small, structured class for students with autism who are cognitively capable of completing grade level academic work but need emotional supports and the use of a behavior intervention plan in a highly structured environment." Id. at 10. Erickson testified that she

"might have indicated that [D.E.] needed a nonpublic school program." Id.

Tina McCourt, the program director at the Rebecca School, (McCourt: Tr. 531), testified about meeting D.E., the features of the Rebecca School, and how the Rebecca School would integrate D.E. into classes, IHO Dec. at 10-11.

M.E. testified at the hearing, discussing D.E.'s behavioral problems at PS 255, including incidents when the school called police and emergency medical personnel. Id. at 11-12. She also testified about the IEP meeting on February 15, 2012, during which she "inquired about a non public school" and reminded other IEP meeting participants that D.E. "had done well in a less restrictive 8:1:2 setting in preschool and expressed her belief that the tantrums stemmed from the inappropriate 12:1:1 setting." Id. at 12. She testified that, notwithstanding her input, "the team recommended the 6:1:1 program with a 1:1 paraprofessional." Id.

M.E. testified that she found PS 226 inappropriate because D.E. "was the most verbal child in the class available and he would age out at the end of the summer." Id. at 13. She went on an "official tour of 6:1:1 and 8:1:1 classes at PS 226@76, including the one [M.E.] was told would be [D.E.'s]. These students were there for the summer and seemed low functioning, some not verbal and all on modified assessment not standard assessment like her son." Id. M.E. testified that she visited PS 94, but "the students she observed there would not be the ones [in D.E.'s class] in September. [M.E.] was told that the class would be a mixture of disabilities and functioning levels but each student would be taught to their IEP's." Id. She described her search to find D.E. a seat at a nonpublic school, which culminated in an offer from the Rebecca School. Id. Finally, M.E. stated that she could not "afford the [Rebecca School's] tuition as her only sources of support are public assistance and [Supplemental Security Income] for her son." Id.

3.  The IHO Decision

The IHO issued a decision in M.E.'s favor on October 16, 2012.  Id. at 20.  The IHO

noted that the DOE had argued that the only inquiry the IHO should undertake is

> whether the IEP of February 15, 2012 is appropriate within its four corners. Does
> it describe the student — his strengths, deficits, goals and functional levels —
> accurately and sufficiently? Is the program recommendation of a 6:1:1 class
> reasonably calculated to address his academic, social/emotional and management
> needs so as to permit progress?

Id. at 16-17.  Thus, the IHO noted, the DOE declined to present evidence as to the proposed

implementation of the IEP, "i.e., the specific school and class the student would attend."  Id. at

17.

The IHO concluded that given D.E.'s behavioral issues, "it was essential he attend a

structured setting with small classes and professionals skilled in working with students on the

autistic spectrum."  Id.  The IHO accepted that the recommended 6:1:1 program for M.E. was

"appropriate."  Id. at 18.  However, the IHO noted that M.E. had "superior cognitive ability and

good language skills" and stated that "for this student I find that the specific placement details of

implementation are a crucial component of FAPE."  Id.  The IHO stated that because D.E. had

"learning characteristics [which] are not typical of the autistic population, I find it is essential as

part of FAPE to assess the functional grouping of a class proposed for him."  Id.

The IHO concluded:

> [A]n appropriate program for [D.E.] must include the presence of at least some
> classmates who are verbally and intellectually compatible and who will provide
> socialization and modeling opportunities.  From the testimony of Ms[.] Wang and
> the mother, there are some 6:1:1 classes that contain higher functioning students
> and such a class is appropriate for this student and not any generic 6:l:1 class. As
> the DOE presented no evidence of the functional grouping and learning
> characteristics of a proposed class (or of more than one such class if unspecified
> which one), I find that it has failed in its burden to prove it recommended a FAPE
> for the 2012-2013 school year.

12

Id. at 19.  The IHO required the DOE to pay for D.E.'s tuition at the Rebecca School and provide

transportation.  Id. at 20.

    D.  Proceedings before the SRO

    The DOE appealed the IHO decision to a State Review Officer on November 19, 2012.

See Notice with Petition, dated Nov. 19, 2012.  The SRO's decision considered only the FNR of

July 24, 2012, inasmuch as the SRO determined that this was the only FNR considered by the

IHO.  SRO Dec. at 10 n.12.  The SRO overturned the IHO decision.  Id. at 13.  In doing so, the

SRO cited approvingly case law holding that

> where a parent enrolls the child in a private placement before the time that the
> district would have been obligated to implement the IEP placement, the validity
> of proposed placement is to be judged on the face of the IEP, rather than from
> evidence introduced later concerning how the IEP might have been, or allegedly
> would have been, implemented.

SRO Dec. at 11 (internal quotation marks omitted) (quoting A.M. v. New York City Dep't of

Educ., 964 F. Supp. 2d 270, 286 (S.D.N.Y. 2013).

    The SRO noted that the IHO had "determined that the February 2012 IEP complied with

the FAPE requirements established by federal law and 'that the recommended 6:1:1 program

with a 1:1 paraprofessional was appropriate' for the student."  SRO Dec. at 12 (quoting IHO

Dec. at 19).  The SRO found that "[t]he hearing record amply supports the IHO's finding."  Id.

The SRO reviewed the February 2012 IEP at length and concluded that

> the record reflects that the student exhibited highly intensive management needs
> that required individualized attention and intervention, such that the February
> 2012 CSE's recommendation to place the student in a 6:1+1 special class in a
> specialized school with an individual full-time crisis management
> paraprofessional and related services was designed to address the student's
> academic, social and behavioral needs, and accordingly, was reasonably
> calculated to enable the student to receive educational benefits.

SRO Dec. at 12 (citation omitted).  In light of this finding, the SRO concluded that "it was error

for the IHO to determine that, although the February 2012 IEP . . . [was] appropriate for FAPE purposes, the school district nonetheless deprived the student of a FAPE due to its failure to provide sufficient evidence of appropriate functional grouping at the assigned school." Id. at 12-13.  The SRO stated that "speculation requiring a retrospective analysis of whether or not the district would have executed the . . . IEP at the assigned public school site with respect to functional grouping is not an appropriate inquiry under the circumstances of this case." Id. at 13. The SRO decided that "the district was not obligated to present retrospective evidence at the impartial hearing regarding the execution of the student's program at the particular public school site . . . or to refute the parent's claims" because it was

> undisputed that the parent rejected the program recommended by the CSE, intended to enroll the student in a private school if she was awarded direct payment of tuition and the student had not attended the assigned public school site specified in the July 24, 2012 FNR prior to the date of the parent's Amended Request for Impartial Hearing or the impartial hearing itself.

Id.

Because the SRO found that the district was not obligated to present evidence before the IHO as to the implementation of D.E.'s IEP, the SRO found that "the IHO was in error to rule that the district denied the student a FAPE for the 2012-13 school year by failing to establish at the hearing that the functional grouping in the classroom at the assigned school — which the student admittedly had not attended — would have been appropriate for the student." Id.  As a result, the SRO found that the DOE "sustained its burden to establish that it offered the student a FAPE" and that DOE was not responsible for D.E.'s tuition at the Rebecca School.  Id.

II.  GOVERNING LAW

A.  Summary Judgment in IDEA Cases

Where there is an appeal of the SRO's decision to a federal district court, the court

reviews the entirety of the administrative record in addition to supplemental evidence upon

either party's request.  See 20 U.S.C. § 1415(i)(2)(C)(i)–(ii).  A summary judgment motion

"serves as a pragmatic procedural mechanism for reviewing a state's compliance with [the

IDEA] . . . the procedure is in substance an appeal from an administrative determination."

Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ., 397 F.3d 77, 83 n.3 (2d Cir. 2005)

(internal citations and quotation marks omitted).  The court "typically considers the propriety of

the IEP" at summary judgment in IDEA cases, rather than identifying disputes over material

facts.  M.H. v. New York City Dep't of Educ., 685 F.3d 217, 225 (2d Cir. 2012).

    B.  IEP Adequacy

    As noted, the first prong of the Burlington/Carter test asks whether the IEP is adequate.

Courts undertake a two-step analysis in evaluating this prong.

> The first part examines the procedural adequacy of the IEP, asking "whether the
> state has complied with the procedures set forth in the IDEA." R.E. v. N.Y.C.
> Dep't of Educ., 694 F.3d 167, 190 (2d Cir. 2012) (quoting Cerra v. Pawling Cent.
> Sch. Dist., 427 F.3d 186, 192 (2d Cir. 2005)).  Procedural violations will entitle
> parents to reimbursement only if they "impeded the child's right to a [FAPE],"
> "significantly impeded the parents' opportunity to participate in the
> decisionmaking process regarding the provision of a [FAPE] to the parents'
> child," or "caused a deprivation of educational benefits." 20 U.S.C.
> § 1415(f)(3)(E)(ii); see also R.E., 694 F.3d at 190. The second part of the test
> examines the substantive adequacy of the IEP by asking whether it was
> "reasonably calculated to enable the child to receive educational benefits."
> Rowley, 458 U.S. at 207, 102 S. Ct. 3034; see also R.E., 694 F.3d at 190. In
> determining the substantive adequacy of the IEP, we must also consider whether
> the state complied with the IDEA's [Least Restrictive Environment] requirement
> by educating the child, to the maximum extent appropriate, with children who are
> not disabled.  See 20 U.S.C. § 1412(a)(5)(A); M.W., 725 F.3d at 143–46.
> "Substantive inadequacy automatically entitles the parents to reimbursement," as
> long as the parents' alternative placement was appropriate and equitable
> considerations favor reimbursement. M.W., 725 F.3d at 143 (quoting R.E., 694
> F.3d at 190); see also Florence Cnty. Sch. Dist. Four v. Carter, 510 U.S. 7, 15–16,
> 114 S. Ct. 361, 126 L. Ed.2d 284 (1993); Sch. Comm. of the Town of Burlington
> v. Dep't of Educ., 471 U.S. 359, 369–71, 105 S. Ct. 1996, 85 L.Ed.2d 385 (1985)

T.M., 752 F.3d at 160-61(first two alterations in original).  The plaintiff's memorandum of law

has not made a challenge to this Court based on inadequacies of the procedures used to develop

the IEP.  Accordingly, we examine only the substantive adequacy of the IEP.

An IEP is substantively adequate if it is "reasonably calculated to enable the child to

receive educational benefits."  Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley,

458 U.S. 176, 207 (1982).  An IEP satisfies this standard when it is "likely to produce progress,

not regression" and "affords the student an opportunity greater than mere trivial advancement."

Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 195 (2d Cir. 2005) (internal quotation marks

omitted) (quoting Walczak, 142 F.3d at 130).  Thus, the IEP does not need to "furnish[]

. . . every special service necessary to maximize each child's potential," Rowley, 458 U.S. at

199, by "provid[ing] everything that might be thought desirable by loving parents," Walczak,

142 F.3d at 132 (internal quotation omitted).

III.  STANDARD OF REVIEW

The Second Circuit has described a district court's standard of review in cases under the

IDEA as follows:

> Although the district court must engage in an independent review of the
> administrative record and make a determination based on a "preponderance of the
> evidence," Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120 (2d Cir.1997),
> the Supreme Court has cautioned that such review "is by no means an invitation
> to the courts to substitute their own notions of sound educational policy for those
> of the school authorities which they review," Rowley, 458 U.S. at 206, 102 S. Ct.
> 3034.  To the contrary, federal courts reviewing administrative decisions must
> give "due weight" to these proceedings, mindful that the judiciary generally
> "lack[s] the specialized knowledge and experience necessary to resolve persistent
> and difficult questions of educational policy." Id. at 206, 208, 102 S. Ct. 3034
> (internal quotation marks omitted).

Gagliardo, 489 F.3d at 112-13.  Nonetheless, the due weight a court "ordinarily must give to the

state administrative proceedings is not implicated with respect to . . . issues of law, such as the

16

proper interpretation of the federal statute and its requirements."  Lillbask, 397 F.3d at 82

(citation and internal alteration omitted).

The Second Circuit provided additional guidance on the standard of review in M.H. v.

New York City Dep't of Educ., 685 F.3d 217 (2d Cir. 2012):

> In many determinations made by administrative officers, the district court's
> analysis will hinge on the kinds of considerations that normally determine
> whether any particular judgment is persuasive, for example whether the decision
> being reviewed is well-reasoned, and whether it was based on substantially
> greater familiarity with the evidence and the witnesses than the reviewing court.
> But the district court's determination of the persuasiveness of an administrative
> finding must also be colored by an acute awareness of institutional competence
> and role.  By way of illustration, determinations regarding the substantive
> adequacy of an IEP should be afforded more weight than determinations
> concerning whether the IEP was developed according to the proper procedures.
> Decisions involving a dispute over an appropriate educational methodology
> should be afforded more deference than determinations concerning whether there
> have been objective indications of progress.  Determinations grounded in
> thorough and logical reasoning should be provided more deference than decisions
> that are not.  And the district court should afford more deference when its review
> is based entirely on the same evidence as that before the SRO than when the
> district court has before it additional evidence that was not considered by the state
> agency.

Id. at 244 (citations omitted).  Also, a court must defer "to the IHO and SRO's findings, which

were grounded in credibility determinations made by the IHO after hearing the relevant

testimony."  Id. at 255.

Where there is a conflict between the IHO decision and the SRO decision, a court

"defer[s] to the reasoned conclusions of the SRO as the final state administrative determination."

C.F. ex rel. R.F. v. New York City Dep't of Educ., 746 F.3d 68, 77 (2d Cir. 2014) (citation

omitted).  "However, where the SRO's determinations are insufficiently reasoned to merit

deference, the courts should defer to the IHO's analysis.  Additionally, the courts should defer to

the IHO's analysis when considering an issue not reached by the SRO."  Id.  (citations omitted).

17

The deference due to an SRO decision depends on the "quality" of the opinion.  See R.E., 694 F.3d at 189.  Federal courts reviewing the decision "must look to the factors that normally determine whether any particular judgment is persuasive, for example, whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court."  Id. (citation omitted).  "[A] court must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned, in which case a better-reasoned IHO opinion may be considered instead."  Id.

IV.  DISCUSSION

During the briefing, the parties disputed whether M.E. was entitled to make a "prospective" challenge — that is, an argument that a proposed school placement is not capable of implementing the IEP — at all.  M.E. took the position that such challenges were permissible, see, e.g., P. Mem. at 25-26, while the DOE cited to case law holding that where a student never enrolls at a proposed placement school, the student is barred from seeking relief, e.g. D. Mem. at 20.  After the cross-motions were filed, the Second Circuit issued its decision in M.O., which made clear that there is no per se bar to "prospective" challenges.  See M.O., 793 F.3d at 244.  In other words, M.O. held that parents are not required to place the child in a school before challenging the placement.  Rather, parents may challenge a school prospectively if they provide appropriate evidence that the school cannot implement the IEP.

Nonetheless, M.O. held that a parent could not make "substantive attacks on [an] IEP . . . couched as challenges to the adequacy of [the proposed placement school]."  Id. at 245.  In M.O., the parents attacked the school placement based on "the very same challenges directed at [the] IEP."  Id.  Thus, in M.O., the parent complained both that the IEP permitted a

18

student-teacher ratio that was too large and at the same time asserted that the proposed

placement had a student-teacher ratio that was too large.  Id.  M.O. held that such a challenge did

not relate to the school's "capacity" to implement the IEP but rather related to the

"appropriateness of the IEP's substantive recommendations."  Id.  M.O. emphasized that the

substantive adequacy of the IEP, however, "must be determined by reference to the written IEP

itself," id. (citing R.E., 694 F.3d at 187) — that is, not by reference to the proposed placement.

　　　　M.O. also addressed the burden on the school district where a parent makes a challenge

that is in fact a substantive attack on the IEP rather than a challenge to the proposed school's

capacity to provide the services mandated by the IEP.  In such an instance, a school district is

"not required to present evidence regarding the adequacy of [the placement] at the impartial

hearing."  Id. at 246.  In M.O., one of the challenges the plaintiff had made was that "the school

district did not present any evidence that the proposed placement classroom . . . was grouped

appropriately."  Id. at 242.  M.O. found that this challenge was really a challenge to the IEP, and

thus found that the school district had no obligation to present evidence on this question.  See id.

at 245.

　　　　Additionally, and of particular significance for this case, M.O. described the appropriate

basis on which a "prospective" challenge by a parent could be successful.  It held that a parent

cannot overturn a DOE decision merely by speculating "that a school with the capacity to

implement a given student's IEP will simply fail to adhere to that plan's mandates."  Id. at 244

(citation omitted).  It provided an example of a challenge that would not be speculative: a

contention that an IEP "cannot be implemented at a proposed school that lacks the services

required by the IEP," such as an IEP that required accommodation of a seafood allergy at a

school that could not guarantee the absence of seafood.  Id. (citing D.C. ex rel. E.B. v. New York

City Dep't of Educ., 950 F. Supp. 2d 494, 513 (S.D.N.Y. 2013)).  M.O. thus approved challenges that could show that a proposed placement was "facially deficient."  Id. at 244-45.

In this case, the SRO appears to have erroneously concluded that M.E. was barred from challenging the proposed placement in any form on the ground that she had never enrolled the child in the proposed school.  See SRO Dec. at 12-13; accord id. at 11 ("if it becomes clear that the student will not be educated [i.e., will not attend a public school] under the proposed IEP, there can be no denial of FAPE due to the failure to implement the IEP.").  This does not mean, however, that we must defer to the IHO's resolution of this case.  Almost precisely the same situation existed in M.O., which found that the SRO decision relied "on an erroneous determination" that a prospective challenge to a placement is always impermissible.  M.O., 793 F.3d at 245.  M.O. nevertheless concluded that the IHO's determination was legally incorrect and upheld the SRO's decision finding that the child received a FAPE.  Id. at 245-46.  We reach the same result here.

Here, the IHO never made a finding that the IEP was procedurally or substantively inadequate.  Nonetheless, the IHO determined that an "appropriate" program for D.E. "must include the presence of at least some classmates who are verbally and intellectually compatible and who will provide socialization and modeling opportunities."  IHO Dec. at 19.  This statement manifests the very type of challenge that M.O. forbade: that is, a "substantive attack[] on [an] IEP . . . couched as [a] challenge[] to the adequacy of" a proposed placement.  M.O., 793 F.3d at 245.  M.E., however, never made a substantive attack on the IEP administratively.  Her due process complaint found no fault with the IEP.  See Ex. V, Amended Request for Impartial Hearing, dated July 26, 2012.  Nor does she challenge the IEP in her briefing before this Court.

Rather, M.E.'s administrative due process complaint asserted that the schools she was

offered to <u>implement</u> the IEP were inadequate.  <u>See id.</u> at 2 ("Unfortunately, the placement and program offered are inappropriate to meet [D.E.'s] academic, social, and behavioral needs for the 2012-2013 school year."); <u>id.</u> ("Although the recommended program at P.S. M226 may have been adequate to address his social development in the past, it could no longer provide him with an appropriate education to meet his academic and functioning needs for either kindergarten (2011-2012) or for first grade (2012-2013).").  The plaintiff's briefs at the hearing likewise complained about the placements proposed by the school district, not the substance of D.E.'s IEP.  <u>See</u> IHO Ex. II at 10, IHO Ex. IV at 3-5.

 <u>M.O.</u> teaches that in such circumstances, the plaintiff must provide evidence on the issue of placement that is not "speculative."  <u>M.O.</u>, 793 F.3d at 244.  While not defining further what constitutes a speculative claim, courts have commonly held that a claim is <u>not</u> speculative when "the alleged defects of the placement were reasonably apparent to Plaintiff or the DOE when Plaintiff rejected [a proposed school]."  <u>Scott ex rel. C.S. v. New York City Dep't of Educ.</u>, 6 F. Supp. 3d 424, 445 (S.D.N.Y. 2014); <u>accord</u> <u>B.P. v. New York City Dep't of Educ.</u>, 2015 WL 9487873, at *2 (2d Cir. Dec. 30, 2015) (summary order) (interpreting <u>M.O.</u> to mean that the "school district must produce evidence as to adequacy of placement school when confronted with <u>permissible</u> prospective challenge") (emphasis added); <u>D.C. ex rel. E.B.</u>, 950 F. Supp. 2d at 510; <u>B.R. ex rel. K.O. v. New York City Dep't of Educ.</u>, 910 F. Supp. 2d 670, 677-78 (S.D.N.Y. 2012); <u>E.A.M. v. New York City Dep't of Educ.</u>, 2012 WL 4571794, at *11 (S.D.N.Y. Sept. 29, 2012).  We will accept this standard, as does plaintiff, <u>see, e.g.</u>, P. Mem. at 24, but find that the evidence before the IHO did not meet it.

 In essence, M.E.'s argument that DOE could not implement the IEP is premised on M.E.'s view (1) that the expected functional level of the students in D.E.'s class in 2012-13 at

both PS 226 and PS 94 would be below his own level and (2) that the IEP could not be implemented if D.E.'s classmates were functionally below his level. M.E. did not present non-speculative evidence, however, with respect to either of these points.

M.E. visited PS 226 on May 8, 2012. (M.E.: Tr. 476; see also Berger: Tr. 26). M.E. testified that D.E. participated in a classroom lesson for "ten minutes" and during that lesson "[h]e was the most vocal child there." (M.E.: Tr. 477). Berger testified about the visit as well. (Berger: Tr. 20, 26, 44). She showed M.E. and D.E. two 6:1:1 classrooms. (Berger: Tr. 20, 40). One of those classes had five students. (Berger: Tr. 20). Some of these students had "some verbal language and academic skills," while the others "would be considered nonverbal students." (Berger: Tr. 21). The five students performed at varying levels in reading and math. (Berger: Tr. 41) ("one is reading at grade level, the other is probably just below or at [grade level], and then there are [three] students that are below grade level"; the students' math skills were "similar"). The teacher of this five-student classroom used "differentiated instruction" to "meet all of the students' needs in teaching a lesson . . . by providing instruction at the level they're at." (Berger: Tr. 42).

Qikang Wang was the teacher in a five-student classroom M.E. observed. (Wang: Tr. 40) (rendering Wang's name as "Jhi Kan Wang"). She also taught D.E. during his time in summer school at PS 226@76. (Wang: Tr. 351). Wang had "five different students and they have three different [reading] levels" (Wang: Tr. 344). The two most advanced readers had "Kindergarten level" reading skills. (Wang: Tr. 345). She also described having students at three different levels of math skills. (Wang: Tr. 346). Wang accommodated these differences with a "differentiate[d]" teaching method, which involved "ask[ing] questions based on [the students'] level." (Wang: Tr. 347).

Wang's students' "verbal abilities" were also varied.  (See Wang: Tr. 349-50).  She had "two students that . . . can communicate with an adult, and their basic needs.  They like to communicate with themselves, very social.  And then the other two, it's learning to communicate . . . and we have one student whose level is just to imitate what you ask him, he imitates back." (Wang: Tr. 350).  The two best communicators "ha[d] some pragmatic problems, but in general they can carry on a very simple conversation."  (Wang: Tr. 351).  Wang testified that the goals in D.E.'s IEP were "the same" as the students in her April 2012 class.  (Wang: Tr. 353).

Thus, the evidence regarding the composition of the class D.E. visited at PS 226 in the spring of 2012 did not permit a finding that his peers in the 2012-13 school year would be below his functional level.  To the contrary, there was essentially no evidence in the record on this issue.

As to PS 94, M.E. visited "two classrooms" at PS 94, which contained "one child [who] was mentally retarded.  Some had other abilities.  [M.E. had] no idea what were [their] disabilities.  Some were non-verbal.  Some were low functioning.  The children that appeared to be higher functioning speaking with verbal skills would not be in the classroom in September." (M.E.: Tr. 483).  However, as M.E. herself testified, the students in the classrooms she visited were "kids for the summer school" and they were "not likely . . . [to] be the children [D.E.] would be in school with.  Some of the children would be moving on, that they would have a mixed range of children in the classroom."  (M.E.: Tr. 482).  One PS 94 employee did tell her that "typically the higher functioning children would be placed in a different classroom setting other than [the 6:1:1] classroom" and that "for a 6:1:1 class, [class composition] would range from . . . MR or intellectually disabled to low functioning students."  (M.E.: Tr. 483-84).  The same PS 94 employee also told M.E. that there would be a mixture of standard and modified

23

curriculum students and that the employee "[did not] know how many students would have [modified curriculum], but that they would teach them according to their individual levels." (M.E.: Tr. 484).  M.E. thus provided some evidence, albeit hearsay and not unequivocal, that the expected functional level of the students in M.E.'s class at PS 94 in 2012-13 would have been below his own level.  The evidence on this point, however, was extremely thin.  The best that plaintiff could muster were unsupported predictions by a teacher and her own speculation as to the composition of the school in September 2012.  (M.E.: Tr. 483).

On the question of whether the IEP could not be implemented if D.E.'s classmates were not at his level, M.E. similarly presented speculative evidence.

Caroline Wiest's testimony established that D.E. could progress among functionally mixed peers. Wiest taught D.E. for two years, from 2009-2011, at PS 226.  (Wiest: Tr. 57).  D.E. was in preschool at the time.  (Wiest: Tr. 58).  "The majority of the students within [Wiest's] classroom, particularly [during D.E.'s] second year, were not at the same level as [D.E.] in terms of social and communicative skills . . . ."  (Wiest: Tr. 59).  "[S]ome students . . . were nonverbal, some students . . . were emerging, and [D.E.] was at a conversational level."  (Wiest: Tr. 60). D.E. was the only child in the class that had "[D.E.'s] level of a back and forth conversation . . . other students . . . would . . . comment on activity, but to be able to have a typical conversation from start to finish on one topic was not something that was mastered in the other students."  Id.  Nonetheless, Wiest testified that over the course of those two years, D.E.'s ability to fully participate in the classroom improved.  (See Wiest: Tr. 59) (when D.E. first came to Wiest's class, he "required modeling and direct instruction, he needed modified group activities to help him maintain focus and participate, and over his two years in our program, those types of prompts and structures were faded and he began to function at a more independent

24

level.").  Also, D.E. improved academically.  (Wiest: Tr. 62) ("He was learning new skills in a group format, he showed a great deal of interest in math and ELA activities, his handwriting was developing . . . he was able to increase the difficulty of tasks during his time in our program."). Likewise, his behavior "most certainly" improved during his time in her classroom.  (Wiest: Tr. 64).  Wang testified that D.E. progressed in her 6:1:1 summer school class.  (Wang: Tr. 356). She identified "transition[ing]," averting "temper tantrum[s]," and "immediately engag[ing] in [an] activity" after an outburst as "things that [Wang found] that he's more – doing good [sic]." (Wang: Tr. 357; see also Wang: Tr. 358-59 (describing how D.E.'s tantrums were less intense and strategies Wang employed to minimize tantrums)).

Dr. Erickson testified at length as to how D.E. would benefit from being surrounded by high-functioning students (Erickson: Tr. 124-25, 127-28, 134-36).  Her conclusions, however, were not grounded in the critical legal standard of whether D.E. would regress rather than progress.  Thus, she testified that in a group of lower functioning students, D.E. was "likely [to] be under-stimulated, meaning you might see more disruptive behaviors because of boredom, because he wasn't engaged in the task."  (Erickson: Tr. 125).  For this reason, she said it was "very important" that he be in a class with students who were verbal, (Erickson: Tr. 127) — though as already noted, there is no non-speculative evidence that he would not have been among verbal students had he actually gone through with the placement.  Dr. Erickson made a "recommendation that [D.E.] be referred to be placed in a small, structured class for children with autism who are cognitively -- capable of completing grade level work, but who require emotional support in a highly-structured environment."  (Erickson: Tr. 134).  But, once again, she provided no evidence that addressed specifically the kinds of environments that could be expected at PS 94 and PS 226 and whether he was likely to "regress" rather than "progress" at

these schools.  Cerra, 427 F.3d at 195 (citation omitted).  Even the IHO never made this finding directly.  Instead she found only that an "appropriate program" for D.E. had to include the presence of at least some classmates who were "verbally and intellectually compatible."  IHO Dec. at 19.

In the end, the evidence presented to the IHO that the IEP could not be implemented at either PS 226 or PS 94 did not rise above the speculative level and certainly did not rise to a level that would  allow the conclusion that it was "reasonably apparent" that the schools could not implement M.E.'s IEP.  As was noted in E.A.M., a case discussing functional grouping, the relevant inquiry is "not whether the Placement Classroom provided all possible support to ensure that the Student did not lose focus, but rather whether objective evidence indicated that she was likely to progress, not regress, under the proposed plan.  2012 WL 4571794, at *12 (citation omitted and internal punctuation altered).  The evidence here was insufficient to allow the IHO to conclude that D.E. would regress and not progress at either of the two schools at issue that were proposed for his placement.

IV.  CONCLUSION

For the foregoing reasons, the plaintiff's motion for summary judgment (Docket # 16) should be denied and the defendant's motion for summary judgment (Docket # 22) should be granted.

**PROCEDURE FOR FILING OBJECTIONS TO THIS
REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections.  See also Fed. R. Civ. P. 6(a),

(b), (d).  Such objections (and any responses to objections) shall be filed with the Clerk of the

Court, with copies sent to the Hon. Lewis A. Kaplan at 500 Pearl Street, New York, New York

10007.  Any request for an extension of time to file objections must be directed to Judge Kaplan.

If a party fails to file timely objections, that party will not be permitted to raise any objections to

this Report and Recommendation on appeal.  See Thomas v. Arn, 474 U.S. 140 (1985); Wagner

& Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84,

92 (2d Cir. 2010).

Dated: February 23, 2016

        New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

27